UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x  INDEX NO. 06-CV-15298
DARLY BRUTUS,

                                  Plaintiff,

   -against-


SILVERSEAL CORPORATION,
MR. PRESTIA and TEJADA,

                                 Defendants.
-----------------------------------------------------------------x

### PLAINTIFF'S STATEMENT OF DISPUTED FACTS PURSUANT LOCAL RULE 56.1

Plaintiff Darly Brutus, by his attorney, Chidi Eze, for his statement of disputed material facts pursuant to SDNY Local Civil Rule 56.1, submits that the following facts are fully in dispute:

1. Plaintiff holds a bachelors degree in sociology from Hunter College in New York from where he graduated in May 2002. Plaintiff has also undergone fire safety courses and other security management courses and seminars. (**Exh 2**, aff. of pl.; see also **Exh 10** - plaintiff's resume and degree certificate).

2. Prior to being employed by the defendants, plaintiff was employed as a supervisor in Securitas, a private security firm, from 1994 to 2002, for Eight (8) years. (**Exh 2**).

3. Plaintiff was hired by defendants as a security guard in May 2002 after he applied for the job through Monster.com. (**Exh 2**).

4. Plaintiff work performance and product has been excellent. In fact, plaintiff has never been justifiably reprimanded nor disciplined for any infraction. Plaintiff is very well liked and respected amongst his colleagues, prior to his complaints of discrimination. Assistant site Director Luben described plaintiff as a decent worker who is always courteous. **(Exh 6**, pp. 54-55). Manager Joshua Clinard wrote the following about plaintiff in 2002, prior to plaintiff's discrimination complaints "[S]ecurity officer Brutus brings an abundance of experience and knowledge to the team. His eagerness to perform any and all tasks assigned is a model for all to follow. Officer Brutus possesses an inate (sic) ability to learn from any and all transgressions." (**Exh 12**, p. 2 - performance evaluation). Vice president Eisenhauer wrote in the same document "s/o Brutus has proven himself to be a dedicated and diligent security professional." (**Exh 12**, p. 2).

5. In August of 2002, SEAL posted two vacancies for a supervisory position for which plaintiff applied. However, SEAL refused to hire plaintiff into any of those positions, instead decided to hire two White individuals from outside the company. These individuals, Meletiche and Fitzpatrick, were no more qualified for the job than plaintiff..

6. Further, Iantcho Ianakiev, a White employee who is related to then site administrator, Mr. Luben Mihaylov (both are certainly from the same country; Bulgaria) was promoted to a manager after two months of working as security guard and notwithstanding that he was hired as security guard two years after plaintiff. (**Exh 2**, aff. Pl.). Although Luben put that time frame for Ianakiev's promotion to be 'less-than-one-year' (**Exh 6**, pp. 56-57).

7. Other individuals who were hired or promoted to security manager (which is same as security supervisor) since plaintiff became employed in May 2002, who are equally or less qualified than plaintiff include, but not limited to; Ed Infante (Spanish), Hilda Malave (Spanish), Peter Fowler (White), Iantcho Ianakiev (White), Anthony Mitchell, Luis Tejada (Spanish), Meletiche (White), Fitzpatrick (White), Mark Colon (White), Robertson (Black, non-Haitian), Tim Garces (Spanish), Joshua Clinard (White), Luben Mihaylov (White, now a Director), William Baez, Andre Melendez (Spanish). Plaintiff alleges that Spanish and White individual are treated more favorably. (**Exh 2**). Plaintiff contends that no black security guard hired after plaintiff was employed had been promoted to a manager.[1] (**Exh 2**)

8. From around May of 2003 to October of 2004,[2] SEAL repeatedly hired supervisors, both from inside and outside the firm without advertising for those jobs and without informing plaintiff of any of those vacancies. These individuals were mostly White and Hispanics, and in any case, none of them were of the same national origin as plaintiff. Plaintiff was never informed of those vacancies notwithstanding repeatedly inquiring for same. (**Exh 2**, aff. of pl.).

9. On October 18, 2004, plaintiff filed a complaint with the Commission on Human Rights, charging SEAL with unlawful discriminatory practices for denying him positions for

---

[1]. First level of promotion from security guard is manager (or supervisor as it used to be call).

[2]. SEAL claims that it did not advertized promotional opportunities in this period.

which he was qualified, in favor of others outside his protected class and for intentionally failing to announce open positions, in writing or verbally, for fear that he would apply. In his human rights complaint, plaintiff alleged a continuous violation starting from August 2002 to October 2004, thus, was when within the time limit to file his human rights complaint with the Commission on Human Rights, rights based on the 'continuous violation' theory.

10. SEAL alleges that it did not have a posting policy from May 2003 to October 2004, however, this is only a self-serving statement without any documentary evidence to support that position. The job for which plaintiff applied in August 2002 was posted, with or without a posting policy, therefore it is hard to see how that posting policy was suddenly withdrawn. Either way, there is nothing in writing, or even verbally, to suggest that SEAL had a posting policy at one time and another. Further during the period that SEAL alleges it had no positing policy, it still promoted a host of individuals to supervisory positions without making plaintiff aware of those openings. (See **Exh 7**); (**Exh 2**)

11. On or about November 22, 2004, SEAL responded to the charges of Human Rights violations brought by plaintiff, by filing a position statement through its attorney, Alan Serrins.

12. SEAL and its employees were aware that plaintiff had filed complaint with the Human

Rights Division. (**Exh 4** pp. 11-14); (**Exh 5**, p. 9); (**Exh 6**, p. 24)

13. After plaintiff complained to the Commission on Human Rights, he became the subject of retaliation from SEAL and its agents. Said retaliation came as a result of the Human Rights complaint, thus could not have been raised by plaintiff in that complaint. (**Exh 2**, pl. aff.). His terms and conditions of employment became adversely altered to this day. (**Exh 2**)

14. After the October 2004 human rights complaint, plaintiff suffered severe and enduring adverse employment actions and hostile work environment, including but not limited to, being written up, warned repeatedly without a valid reason, denied holiday work placement, denied pay for taking sick days, physically and verbally abused by SEAL managers and employees, placed on attendance monitoring list for no just cause, denied opportunities to work in a sitting post and other career advancement posts, repeatedly denied bathroom breaks, subjected to vacation pay cut, suspended and docked pay for no just cause, repeatedly subjected humiliation etc. (**Exh 2**, pl. aff.);

15. On or about August 27, 2005, plaintiff was suspended without pay for one day and charged $25 for losing a Nextel Radio notwithstanding the circumstances surrounding the incident, however, similarly situated employees like, Jeffrey, lost their Nextel radios but never suspended nor charged any amount for the loss. On or about April 27, 2005, while plaintiff was on floor patrol with manager Tejada, he was accidentally locked inside a

static room, while Tejada was on the phone on a private matter right outside the static room. Plaintiff called out to him for help, repeatedly banged on the locked door and even radioed him, but he intentionally ignore these calls and the banging on the door, while plaintiff was left inside the static room with dangerous vapor and steam coming from an adjoining room inside the static room. (See **Exh 5**, p. 40-41). Out of hysteria and sheer panic, plaintiff misplaced his Nextel Radio. (See **Exh 11** - report of 9/16/05 prepared by Site Director Maloney).

Plaintiff was charged $25 and suspended for one day without pay for that Radio, even though the radio was later found **(Exh 5**, p. 37), however the manager who wilfully left plaintiff inside the dangerous static room went without reprimand. **(Exh 2)**.

Former administrator, Michael Prestia, deposed that usually no punishment was doled out where radio was lost in emergency situation. (**Exh 5**, p 37).

16.   Since filing the Human Rights complaint in October 2004, plaintiff has repeated been publicly embarrassed and accused of reading on duty. The manager saw a piece of paper on plaintiff's table, and without any inquiry as to how it got there, he immediately delved in a torrent of abuses and the f-word while some Bloomberg employees looked on. Plaintiff was issued with a reprimand for that incident without given an opportunity to defend himself. Upon information and belief, other security guards and managers read on duty without any repercussions. **(Exh 2)**. Assistant site director, Luben, stated during his deposition that in the entire time he had known plaintiff, he had never seen him read on duty. (**Exh 6**, pp. 52-53).

17. On or about February 28, 2006, plaintiff went to the control room to request for a radio from his manager, Luis Tejada, however, upon requesting and obtaining same the manager suddenly turned around, picked up a plastic water bottle and aimed it point-blank at plaintiff with all intent to seriously harm plaintiff, but the bottle which narrowly missed plaintiff by a fraction, exploded on the glass wall panel behind plaintiff, causing plaintiff to be completely drenched in water. Four security guards witnessed that incident, namely; Vargas, Garcia, Williams and Daniel. In a 3/2/06 interview with Director Eisenhauer, plaintiff stated "...he then picked up a bottle of water and just like a baseball pitcher he threw the bottled of water at me." (See **Exh 8**). Plaintiff reported the incident SEAL upper management, the police and his union rep, however, nothing was done to manager Tejada who escaped any sort of punishment to this day. (**Exh 2**).

18. Employees have been hired and promoted within a short period of time, even as little as two months after hire. David Eisenhauer was hired on March of 2001 and promoted August 2001. (**Exh 4**, pp.5-6); (see also **Exh 2**; and **Exh 7**). Defendant Prestia stated that he promoted over 20 employees in his short time as site administrator, while ignoring plaintiff (see **Exh 5**, p.67). Prestia also admitted that only one or two of these individuals were black (**Exh 5**, p.70)[3], and notwithstanding that blacks make up approximately 40% of the security guards employed by defendants. (**Exh 2**). Assistant site director, Luben, was hired as security guard in August of 2001, barely 9 months before plaintiff. He was promoted to a manager within six months of hired, and he is currently SEAL's assistant

---

[3]. It is worth noting that blacks made up a huge number of SEAL security guards.

site director after 3 to 4 promotions. (**Exh 6**, pp. 5-8). Josh Clinard , also White, was promoted within a few months of hire, and was hired after Luben. (**Exh 6**, pp. 19-21). Luben also stated that Iantcho Ianakiev, his countryman, was promoted shortly after he was hired. (**Exh 6**, p 56).

19. Vice-President David Eisenhauer stated that after the Human Rights complaint, he did informed plaintiff that another supervisory position was available, hoping that plaintiff would apply for that position. (**Exh 4**. pp. 12-13). Thus, if plaintiff was so inept as defendants would want this court to believe, why then was he allegedly encouraged by the vice-president to apply for promotion?

20. Since filing the Human Rights complaint, on several occasions, managers Malave, Tejada and Moscoso told the lobby personnel to monitor when plaintiff badged in and out of the premises. Upon information and believe, similarly situated White and Hispanic employees with far worse attendance records were not so subjected. (**Exh 2**). Defendant Prestia stated that monitoring list is for employees who have had 2 or 3 unauthorized absences. (**Exh 5**, pp. 47-48). Clearly plaintiff is not in this category.

21. Beginning October 2004, plaintiff was and still repeatedly denied immediate relief to use the bathroom. Whenever he requested same, it usually takes the control room more than 45 minutes to send relief, especially with managers Moscoso, Tejada and Hilda Malave. On one occasion, plaintiff became so sick that he requested to go home early. (**Exh 2**). Also, once, manager Malave told Mr. Barnes, a colleague, not to allow plaintiff additional mealtime break relief, whereas Mr. Ryan, another colleague came in 45 minutes late from

his meal break and nothing was said to him. (**Exh 2**). Once again, plaintiff made official report of this occurence but nothing was done. Following a request for a meal break relief, manager Moscoso once told plaintiff "you should call your union brothers for meal break relief. I know nothing about that, call your f-cking buddies." (**Exh 2**). No action was taken despite reporting the incident to upper management. Sometime in 2007, manager Moscoso deprived plaintiff of a bathroom break on the 6th floor for over 45 minutes, and this caused plaintiff severe abdominal trauma, causing him to vomit as a result. On that occasion plaintiff was unable to finish his shift due to ill-health, however, he was reprimanded for leaving early, even though he obtained his manager's permission.

22. After filing the Human Rights complaint, plaintiff was repeatedly denied the opportunity to work during holiday periods which attracts higher pay rates. (**Exh 2**). The defendants affords this opportunity to only White or Hispanic employees of lesser seniority than plaintiff, even though the company admits that such work is assigned on seniority basis. (See Exh 9) (see **Exh 4**, pp.39-41 - dep. tr. of vice president Eisenhauer); (see also **Exh 5**, p. 51 -dep. tr. of Prestia); (see also **Exh 6**, p. 55 - dep. tr. of Luben). This discrimination continues to this day notwithstanding several complaints made to Directors Robert Geyer and Colon.

23. A Black employee named Hans Lambert[4] was a manager before the current vice president, Eisenhauer, was hired in 2001. Today he is still a manager, just one step above security guard, after seven or more years in same position. (**Exh 4**, pp. 18-21); (see also

---

[4]. Defendants contend that he is Haitian. (**Exh 5**, p. 28)

**Exh 6**, pp. 65-68). Former administrator, Michael Prestia, deposed that he was hired into the same position as Lambert but was subsequently promoted multiple times ahead of Lambert. (**Exh 5**, pp. 28-29); (see also **Exh 6**, pp. 65-68).

24. Since October 2004, defendants continue deny plaintiff the opportunity to work in the control room, even though he was fully trained to work there, however, similarly situated White and Hispanic employees are not so denied. (**Exh 2**). Former administrator, defendant Prestia, stated that it was himself who ordered that plaintiff be trained for the control room after receiving complaints from plaintiff. He also stated that he was aware that plaintiff was denied the opportunity not work in the control room (**Exh 5**, pp. 29-31), notwithstanding that over 30 employees rotated in the control room (**Exh 5**, p. 34). Working in the control room is significant because not only is it one of the very few seating positions, it also allows one to oversee the activities around the site, which adds credence to one's security experience and resume. In fact, it is a career advancement position, more so that the other locations. (**Exh 2**). Employees with far less seniority than plaintiff work in that location and this includes individuals like; F. Vargas, Vargas, J. Pacheco, Betancourt, Perez, Arroyo Christopherson, Bezrukov, Le. N., etc., all of whom are White or Hispanic. (**Exh 2**). Working in the control room is lucrative, giving the opportunity to get to know the client's system at home and abroad and often bestows managerial credentials. (**Exh 2**)

25. Since October 2004, plaintiff was repeatedly denied the opportunity to work at the reception desk, which is a seating position, by the following managers; Moscoso, Hilda Malave, Parone, Ed Infante, Iantcho Ianakiev, Samaniego and Luis Tejada. (**Exh 2**). He is

only assigned standing positions at the lobby or on the 6th floor. (**Exh 2**). Working at the reception allows for a constant interaction with all types of important people, including visiting associates and Bloomberg LP personnel. It also allows for familiarity with the daily operations of the entire site and provides a managerial ladder. (**Exh 2**).

26. More than twice, beginning 2005, Director Prestia shouted and cursed at plaintiff before some of the client's employees and SEAL employees, because he found a piece of paper on top of plaintiff's high-desk, which he was not reading. (**Exh 2**). However, White and Hispanic employees repeatedly read on duty without reprimand. (**Exh 2**). On one occasion, this harassment and humiliation was so severe that tears started streaming down plaintiff's face, along with a painful migraine causing making it hard for him to continue working that day. Plaintiff reported these incidents to management, but no action was taken. (**Exh 2**).

27. Since filing the Human Rights complaint, plaintiff has been constantly targeted for verbal abuse and humiliation from his colleagues at work, without management stepping in. This includes managers and parallel colleagues like Diana Jacobs, and sometimes before a senior personnel. On another occasion, it was an employee named Nana who put her hand on plaintiff's face and called him names, including using the F-word on him. No action was ever taken despite plaintiff's complaints and despite the fact that the incident was recorded and reviewed by SEAL. (**Exh 2**).

Similar incidents have occurred with other employees at the receiving end and the company had stepped in to discipline the aggressors and in some cases fired the aggressor. (**Exh 2**).

28. Since filing the Human Rights complaint, plaintiff has been repeatedly issued with a no-call-no-show reprimand for no reason, although, in some instances, the reprimand got rescinded after plaintiff complained, but without an explanation and apology for issuing same. (**Exh 2**). On 9/11/07, plaintiff called and received authorization to report late, due to train delay, upon arrival, he was issued with a reprimand. However, under the same manager, and other managers like Hilda Malave and Luis Tejada, White and Hispanic employees come to work really late without calling in, but still get no reprimand. For example, Collada, Perez, Pacheco, Betancourt, Arroyo and other White and Hispanic employees, repeatedly arrive late to work, without even calling to say they were running late, but they get no reprimand. (**Exh 2**). Some of them would usually not call and not show up for work, but never got reprimanded. Plaintiff has also personally complained in writing about these repeated incidents to Director Geyer, but nothing was ever done. (See **Exh 3**). Plaintiff also stated that these incidents cause him to be relieved long after he shift was completed. (**Exh 2**).

29. On another occasion, the site Director accused plaintiff of stealing a magazine from the CEO's desk on the 6th floor and reprimanded him for same. Plaintiff demanded to see the video recording of the alleged incident, but it was never shown to him. (**Exh 2**). All of this was after he made the Human Rights Division complaint.

30. Several times, beginning October 2004, when plaintiff called in sick, his weekly paycheck was docked 8 hours and in addition he got charged vacation time. However, other similarly situated Hispanic and White employees call in sick and that time gets charged to their sick days only, while their vacation days remain intact. (**Exh 2**).

31. Recently, in August of 2008, the company sent two lower ranked employees of Hispanic origin to work at the Republican National Convention in Minnesota for twelve days, August 23 to September 6, with full benefits, travel, hotel lodgings and other allowances. These two individual are Vargas and Damasco. Plaintiff did not even know when that opportunity came around, let alone offered same. (**Exh 2**).

32. Plaintiff is not aware of anyone in that company with a college degree and prior supervisory experience, who is still a security guard after 6 years of excellent service and dedication. (**Exh 2**).

33. SEAL stopped evaluation of employees in 2004/2005 (**Exh 5**, p.63); (see also **Exh 4**, p. 48), yet continue to hire and promote regardless, while ignoring plaintiff..

34. Blacks make up approximately 35-40% of the defendants' workforce. (**Exh 2**).

35. To date the defendants continue to deny plaintiff promotional opportunities while promoting individuals with lower seniority, experience and educational background. Since plaintiff complained to the Human Rights Division, the company no longer advertize or announce promotional opportunities, yet continue to promote. (**Exh 2**).

Dated: Brooklyn, New York
November 28, 2008

                                               Respectfully Submitted,

                                               /s/
                                              Chidi Eze (CE-4333)
                                              Divers' attorney
                                              255 Livingston Street, 3rd Floor
                                              Brooklyn, NY 11217
                                              (718) 643 8800